Alyssa HANSON, on behalf of herself and all others similarly situated, Plaintiff,

v.

TROP, INC., d/b/a Pink Pony, Atlanta, Defendant.

CIVIL ACTION NO. 1:14-cv-01096-AT

United States District Court, N.D. Georgia, Atlanta Division.

Signed 03/03/2016

Anthony C. Lake, Gillen Withers & Lake, LLC, William Grant Cromwell, Cromwell Law Group, Atlanta, GA, Benjamin J. Sweet, Del Sole Cavanaugh Stroyd, Edwin J. Kilpela, Gary F. Lynch, Jamisen Etzel, Carlson Lynch Sweet & Kilpela, LLP, Pittsburgh, PA, Thomas A. Withers, Gillen, Withers & Lake, LLC, Savannah, GA, for Plaintiff.

Stephen Whitfield Brown, William Scott Schulten, Dean R. Fuchs, Schulten Ward & Turner, Atlanta, GA, for Defendant.

### ORDER

Amy Totenberg, United States District Judge

This is a minimum and overtime wage case brought pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C.A. § 201 *et seq.* Plaintiff, an exotic dancer at the Pink Pony club in Atlanta, Georgia, alleges that she was misclassified by Defendant Pink Pony as an independent contractor, and therefore not paid minimum wage or overtime wages as required by the FLSA. Defendant has moved for summary judgment on two grounds: 1) Plaintiff was properly classified as an independent contractor; and 2) Plaintiff does not have sufficient proof of working more than 40 hours on any given week to withstand summary judgment on that claim. For the following reasons, Defendant's Motion [Doc. 32] is **DENIED**.

## I. LEGAL STANDARD

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in

favor of the non-moving party. *Id.* at 249, 106 S.Ct. 2505.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324–26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## II. FACTUAL BACKGROUND [1]

Plaintiff worked as an exotic dancer at Pink Pony for over four years, starting in April 2011. (Declaration of Alyssa Hanson ¶ 2, Doc. 35–3.) When she started the job, she filled out a number of forms, including an "Independent Contractor Agreement," (Declaration of Edward Stone, ¶ 28, Ex A, Doc. 32–4), and a Consent to random drug testing. (Hanson Decl., Ex. C, Doc. 35–5). While Plaintiff worked at Pink Pony, she was not paid a minimum wage and she worked more than 40 hours per week "quite a bit" in 2012 and may have done so in 2013 as well. (Deposition of Alyssa

Hanson at 116:2–9, Doc. 32–3). Plaintiff brought this lawsuit to recover unpaid minimum and overtime wages. As the classification of a worker as an employee or an independent contractor is a fact-intensive inquiry, the Court will include further relevant facts in that analysis below.

## III. DISCUSSION

Defendant argues it is entitled to summary judgment both because Plaintiff was properly classified as an independent contractor under the Eleventh Circuit's six-factor economic realities test, and because Plaintiff has not presented sufficient proof that she worked overtime hours at Defendant's establishment. These two issues are addressed in turn.

### A. Employee or Independent Contractor

Whether the Plaintiff is an "employee" under the FLSA is a question of law for the Court, "with subsidiary findings being issues of fact." *Patel v. Wargo,* 803 F.2d 632, 634 n. 1 (11th Cir.1986); *Antenor v. D & S Farms,* 88 F.3d 925, 929 (11th Cir.1996) ("A determination of employment status under the FLSA ... is a question of law."); *see also Stevenson v. Great Am. Dream, Inc.,* No. 1:12–CV–3359–TWT, 2013 WL 6880921, at *3 (N.D.Ga. Dec. 31, 2013). "The FLSA's overtime and minimum wage protections ... extend only to 'employees.'" *Scantland v. Jeffry Knight, Inc.,* 721 F.3d 1308, 1311 (11th Cir.2013). The FLSA defines "employee" broadly. *Id.* "Independent contractors," however, do not fall within that definition. *Id.* To determine whether a party was an employee or an independent contractor, the Court looks to the

---

1. The factual statement here does not constitute actual findings of fact. The Court derives the facts below from the evidence in the rec-

ord and views these facts in the light most favorable to the Plaintiff.

"economic reality of the relationship between the alleged employee and alleged employer." *Id.* (internal quotation marks omitted). The inquiry focuses on the level of economic dependence. *Id.* at 1312. "[T]he final and determinative question must be whether the ... personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA or are sufficiently independent to lie outside its ambit." *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1311–12 (5th Cir.1976).[2] "The concept has also been put in terms of whether the individual is 'in business for [her]self.' " *Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 302 (5th Cir.1975).

■■■ The Court may consider various factors, such as (1) degree of control, (2) opportunity for profit or loss, (3) investment in equipment or additional personnel required, (4) skill required, (5) duration, and (6) the extent to which the service is integral to the alleged employer's business. *See Scantland*, 721 F.3d at 1312. "[T]hese six factors are not exclusive and no single factor is dominant." *Id.* The Court must assess the facts relevant to these factors "through the lens of 'economic dependence' and whether they are more analogous to the 'usual path' of an employee or an independent contractor." *Id.*

■■ This standard is not susceptible to a simple application. *See Usery*, 527 F.2d at 1311 ("The test is not one which allows for a simple resolution of close cases."). When a disposition in either direction can be justified, the Court must err in favor of a broader reading of "employee." *Id.* ("Given the remedial purposes of the legislation, an expansive definition of 'employee' has been adopted ... a constricted interpretation of the phrasing by the courts would not comport with its pur-

pose."); *see also* Department of Labor, Wage and Hour Division, Administrator's Interpretation No. 2015–1, 2015 WL 4449086, (July 15, 2015) ("DOL Interpretation") *available at* http://www.dol.gov/whd/workers/Misclassification/AI–20151.pdf ("A worker who is economically dependent on an employer is suffered or permitted to work by the employer. Thus, applying the economic realities test in view of the expansive definition of 'employ' under the Act, most workers are employees under the FLSA."). To conclude that a party is an "independent contractor" because she bears some of its characteristics would "invite adroit schemes by some employers and employees to avoid the immediate burdens at the expense of the benefits sought by the legislation." *Usery*, 527 F.2d at 1311; *see also Mednick*, 508 F.2d at 303 ("An employer cannot saddle a worker with the status of independent contractor, thereby relieving itself of its duties under the F.L.S.A. by granting [her] some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have [her] operate.").

To begin, this is not a matter of first impression for this district. Two prior cases have found adult entertainers working under conditions similar to the Plaintiff in this action were "employees" protected by the FLSA. *See Stevenson*, 2013 WL 6880921; *Clincy v. Galardi South Enterprises, Inc.*, 808 F.Supp.2d 1326 (N.D.Ga. 2011). Many other courts have reached the same conclusion. *See Reich v. Circle C. Investments, Inc.*, 998 F.2d 324 (5th Cir.1993); *McFeeley v. Jackson St. Entm't, LLC*, 47 F.Supp.3d 260, 273 (D.Md.2014); *Verma v. 3001 Castor, Inc.*, 2014 WL 2957453 (E.D.Pa. June 30, 2014);

---

**2.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding prece-

dent all of the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

*Butler v. PP & G, Inc.*, No. 13–430, 2013 WL 5964476, *6 (D.Md. Nov. 7, 2013); *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F.Supp.2d 901, 912–13 (S.D.N.Y.2013); *Thornton v. Crazy Horse, Inc.*, No. 06–00251, 2012 WL 2175753 (D.Ak. June 14, 2012); *Thompson v. Linda and A. Inc.*, 779 F.Supp.2d 139, 151 (D.D.C.2011); *Morse v. Mer Corp.*, 2010 WL 2346334, at *6 (S.D.Ind.2010); *Doe v. Cin–Lan, Inc.*, No. 08–12719, 2008 WL 4960170 (E.D.Mich.2008); *Harrell v. Diamond A Entm't, Inc.*, 992 F.Supp. 1343, 1348 (M.D.Fla.1997); *Reich v. Priba Corp.*, 890 F.Supp. 586, 594 (N.D.Tex.1995). *But see Matson v. 7455, Inc.*, 2000 WL 1132110 (D.Or. Jan. 14, 2000); *Hilborn v. Prime Time Club, Inc.*, 2012 WL 9187581 (E.D.Ark. July 12, 2012). Here, evidence in the record as to all six factors sufficiently supports "employee" status such that summary judgment in favor of Defendant must be denied.

### 1. Factor 1: Degree of control

Pink Pony exercised significant control over the Plaintiff in the employment setting. The Court adopts the following statements of the evidence in this case related to control summarized in Plaintiff's brief because they are supported by the record. (*See* Resp. at 8–10, Doc. 35.) In order to work at Pink Pony, Plaintiff was required to consent to random drug testing. (Consent Form, Doc. 35–5 at 2.) Plaintiff was required to check in when she arrived for work and pay to Defendant a "house fee" that was based on her arrival time and set by Defendant. (Hanson Dep. at 72:16–73:17; Stone Decl. ¶ 20.) Every shift, Plaintiff was required to give tips to the club's house mom, DJ, and valet. (Hanson Dep. at 71:14–72:2; 75:10–17; Hanson Decl. ¶ 14.) Defendant required that she work at least three shifts per week. (Hanson Dep. at 31:10–32:13; Hanson Decl. ¶ 3.) Plaintiff has also been required to attend the annual Christmas party and specific mandatory meetings.

(Hanson Dep. at 32:17–33:3; 118:10–23; Hanson Decl. ¶¶ 6, 8.) On at least one occasion, Plaintiff missed a mandatory meeting and was fined $250 by the club's house mom, whom Plaintiff considered one of her supervisors. (Hanson Dep. at 32:17–33:3; 118:10–23.)

Once Plaintiff reported to work, she was not free to come and go as she pleased. Rather, she was required to first pay tip-outs and, if she drove to work, submit to a breathalyzer test before she left. (Hanson Decl. ¶ 9; Hanson Dep. at 72:2–13; 111:11–23.) She had to pay $1 to use the breathalyzer. (*Id.*) And during her shift, Plaintiff was required to perform stage dances when called to stage by the DJ, pursuant to a rotation system controlled by the DJ. (Hanson Decl. ¶ 10; Hanson Dep. at 43:8–20; 58:19–25.) Every stage appearance lasted for three songs. (Hanson Dep. at 51:18–21.) Plaintiff could request certain songs or genres of music during her dances, but Defendant's DJ had ultimate control over the music played at the club. (Hanson Decl. ¶ 10.)

Plaintiff was also required to participate in promotional sequences called "reviews." During the reviews, Plaintiff was required to buy a $10 t-shirt from Defendant. Plaintiff then had to go on stage while the DJ announced that customers could buy two private dances and the t-shirt from Plaintiff for $20. If Plaintiff was unable to sell this package to a customer, she did not get her $10 back from Defendant. (Hanson Decl. ¶ 11; Hanson Dep. at 117:17–118:9.)

Other record evidence further demonstrates the substantial degree of control Pink Pony exercised over Plaintiff's employment. Plaintiff could not charge less than the minimum prices Defendant established for private table-side and VIP area dances. (Hanson Dep. at 36:9–17; 40:24–41:11.) Defendant, and not entertainers,

controls who is hired for the positions of house mom, DJ, and valet. (Hanson Decl. ¶ 15.) Defendant controls the club's hours of operations and the cover charge customers must pay. (Hanson Decl. ¶ 15.) Defendant sells to its guests an artificial currency called "G–Bucks" which can only be used for tipping entertainers and for buying private dances from entertainers. Defendant charges guests a 15% fee to buy G–Bucks, and then takes another 15% fee when entertainers like Plaintiff submit the G–Bucks to Defendant in exchange for U.S. currency. (Hanson Dep. at 46:22–47:11.) Thus, if Plaintiff performs $100 worth of services for a client who opts to pay in G–Bucks, Pink Pony pays Plaintiff only $85.

All of the above forms of control—the issuance of fines, requiring entertainers to work a minimum number of shifts per week, requiring entertainers to go on stage when called, setting mandatory minimum prices for services, requiring entertainers to tip club employees, and requiring entertainers to report their earnings to the club—are relevant in the control analysis and weigh in favor of a finding that Plaintiff is an employee rather than an independent contractor. *See McFeeley,* 47 F.Supp.3d at 268–69; *Verma,* 2014 WL 2957453 at *5–7; *Stevenson,* 2013 WL 6880921 at *4; *Butler v. PP & G, Inc.,* 2013 WL 5964476, *3–4; *Hart,* 967 F.Supp.2d at 913–19; *Clincy,* 808 F.Supp.2d at 1344–45; *Morse v. Mer Corp.,* 2010 WL 2346334 at *3; *Harrell v. Diamond A Entertainment,* 992 F.Supp. at 1348–50.

Defendant argues that other aspects of the employment relationship mitigate any control it exerted. For example, Plaintiff was generally free to take breaks while performing, (Hanson Dep. at 33:4–7;

99:10–100:4), she was not told how to dance, (Hanson Dep. at 56:19–24), she was permitted to and in fact did perform at other clubs, get other jobs,[3] and attend school while a performer at Pink Pony, (Hanson Dep. at 20:2–9; 55–56), and she was free to select her own costumes, shoes, hairstyles, and perfumes to don while performing. (Hanson Dep. at 52:11–54:13; Stone Decl. ¶ 21). She was not required to "weigh in," (Stone Decl. ¶ 23), and she was permitted to eat, drink, and smoke cigarettes on the job. (Hanson Dep. at 56:11–18.) But these are but minor freedoms when considered in the broader picture of Pink Pony's overwhelming control.

Defendant also argues that Plaintiff had some freedom to determine her work schedule. While true, Plaintiff's control over her scheduling represents only minimal control over the employment relationship when compared to all of the elements of the job that Pink Pony controlled. *See Usery,* 527 F.2d at 1312 ("Each operator is given the right to set her own hours ... [i]n the total context of the relationship ... the right to set hours [does not indicate] such lack of control by [the defendant] as would show these operators are independent from it .... [c]ontrol is only significant when it shows an individual ... stands as a separate economic entity."). Furthermore, an entertainer's control over his or her schedule has not stopped courts from finding the entertainer was an employee. *See, e.g., Stevenson,* 2013 WL 6880921, at *4; *Priba Corp.,* 890 F.Supp. at 591; *Harrell,* 992 F.Supp. at 1348.

### 2. Factor 2: Opportunity for profit or loss

Plaintiff and Pink Pony did not share equally in the opportunities for profit and loss. Plaintiff had no authority to hire or manage anyone at Pink Pony (other than

---

**3.** The Court notes that Plaintiff briefly tried to work at an O'Charley's restaurant but "had to quit that job after a few weeks because she could not work out compatible schedules at the restaurant and Pink Pony." (Hanson Decl. ¶ 5; Doc 37 ¶ 2.)

the ability to bring in her own hairstylist and make-up artist, if she so chose). (Hanson Decl. ¶ 15; Stone Decl. ¶ 21.) Although Plaintiff risked a loss equal to the fees she paid—assuming she made nothing in tips—"[t]he risk of loss [was] much greater for the Club." *Clincy*, 808 F.Supp.2d at 1346. Pink Pony bore the vast majority of overhead costs. Pink Pony also had more of an impact on potential profits. Plaintiff "did not invest any money in the Club's building, stage, dancing poles, tables, private dance areas, or any other infrastructure," Plaintiff relied on the Club to attract customers, and the Club determined the hours of operation and the cover charge. (Hanson Decl. ¶¶ 16‑19.)

Defendant argues that Plaintiff could earn more profit based on her "skill, performance, and volume of work." (Defs.' Resp. to Mot. for Summ. J., at 13.) "This argument—that dancers can 'hustle' to increase their profits—has been almost universally rejected." *McFeeley*, 47 F.Supp.3d at 270 (citing *Thompson*, 779 F.Supp.2d at 149; *Hart*, 967 F.Supp.2d at 920; *Clincy*, 808 F.Supp.2d at 1346 n. 12; *Harrell*, 992 F.Supp. at 1350, 1352; *Priba Corp.*, 890 F.Supp. at 593); see also *Stevenson*, 2013 WL 6880921 at *4. To the extent Plaintiff had some control over her profit and loss, Pink Pony's "setting of minimum prices for services also [controlled Plaintiff's] ultimate ability to earn a profit." *McFeeley*, 47 F.Supp.3d at 270 (citing *Priba Corp.*, 890 F.Supp. at 593.) Plaintiff's control over profits was therefore minor compared to Pink Pony's. But for Defendant's "provision of the lavish work environment, the entertainers at the club likely would earn nothing." *Priba Corp.*, 890 F.Supp. at 593.

### 3. Factor 3: Investment in equipment or additional personnel required

Pink Pony invested far more than the Plaintiff on necessary personnel and equipment. It provided the wait staff, bartenders, house moms, floor men, valets, and disc jockeys. (Doc. 32‑2 ¶ 4; Hanson Decl. ¶ 15.) Pink Pony also provided and maintained the facility, the stages, the poles, and all other infrastructure. (Hanson Decl. ¶ 16.) Plaintiff provided her own clothing, makeup, perfumes, and other accessories, but, "[a]s other courts have noted, the amount spent on clothing, hair styling, and make-up is minor when compared to the club's investment." *Stevenson*, 2013 WL 6880921 at *5 (quoting *Harrell*, 992 F.Supp. at 1350; *Reich*, 998 F.2d at 328 ("A dancer's investment in costumes and a padlock is relatively minor to the considerable investment Circle C has in operating a nightclub.")). It is not uncommon for an employee to be financially responsible for maintaining an appearance suitable to her work environment. And while Plaintiff posts items of Facebook related to her performances at Pink Pony, she does not consider that advertising or marketing her business. (Hanson Dep. at 109:9–18.)

Moreover, Pink Pony's investment in the club dwarfed Plaintiff's. The parties do not dispute that, on top of routine maintenance, Pink Pony entered into a settlement agreement with the City of Brookhaven in which Pink Pony agreed: a) to reimburse the City of Brookhaven for its legal fees and expenses in the amount of $283,000, to be paid over the course of twenty months; and b) to pay $150,000–$400,000 per year to the Broohaven police department as a Public Safety Assessment Fee. (Doc. 37 ¶¶ 13–14.) The settlement agreement permits Pink Pony to continue to sell alcoholic beverages until December 31, 2020. (*Id.* ¶ 15.) Whatever trivial investment Plaintiff has made, the evidence before the Court indicates that it was miniscule when compared with Pink Pony's investment.

#### 4. *Factor 4: Skill required*

On the dancing side, courts have routinely found that little "skill"—as the term is used in the FLSA context—is required for exotic dancing. *See McFeeley,* 47 F.Supp.3d at 272; *Stevenson,* 2013 WL 6880921, at *5 ("Taking your clothes off on a nightclub stage and dancing provocatively are not the kinds of special skills that suggest independent contractor status.")(citing *Priba Corp.,* 890 F.Supp. at 593). On the business side, to the extent that sort of skill is relevant in this analysis, little business skills, judgment, or initiative is required to dance at a gentlemen's club that is established and managed by someone else. Defendant also argues that it requires an audition and prefers experienced dancers. As Plaintiff points out, though, that does not distinguish Pink Pony's hiring process from that of most other employers who have some form of application and/or interview process and does not require that its entertainers undergo formal training.

#### 5. *Duration/Lack of permanence*

Plaintiff worked at Pink Pony from April 2011 to 2015. (Hanson Decl. ¶ 2.) During that time, she averaged two to three shifts per week, and at times worked four per week. (Hanson Dep. at 20:17–22:12; 23:18–27:15.) At a few points during her tenure of over four years at Pink Pony, Plaintiff worked fewer nights due to family care obligations. (Hanson Dep. at 23:18–25:25.) Defendant points out that Plaintiff was permitted to and in fact did seek outside employment, including at other gentlemen's clubs. Plaintiff points out that, at one point she tried to maintain a day job at another establishment but had to quit because it conflicted with her schedule at Pink Pony. (Hanson Decl. ¶ 5.) Pink Pony was Plaintiff's primary source of income for several years. (Hanson Dep. at 45:11–15.)

In previous exotic dancer cases, courts have found that the duration/lack of permanence factor is "entitled to only modest weight in assessing employee status under the FLSA." *Hart,* 967 F.Supp.2d at 920. Many courts have therefore placed less emphasis on this element in comparison to the other elements. *See id.*; *Stevenson,* 2013 WL 6880921, at *5 (finding dancers were employees despite the fact that there was "no indication that all of the Plaintiffs worked at Pin Ups for an extended period of time"); *Harrell,* 992 F.Supp. at 1352 ("Other courts have found that exotic dancers tend to be itinerant, but have tended to place less emphasis on this factor[;] ... [t]his Court agrees, and places little emphasis on this factor."); *Priba Corp.,* 890 F.Supp. at 593–94 (noting that the proper focus under this prong is not on the permanence or exclusivity of the relationship, but the nature of the worker's dependence on the putative employer). "The fact that dancers can work at other clubs '[does] not distinguish them from countless workers ... who are undeniably employees under the FLSA—for example, waiters, ushers, and bartenders'—that may simultaneously work for other businesses." *McFeeley,* 47 F.Supp.3d at 272 (quoting *Hart,* 967 F.Supp.2d at 920–21). Taken together, Plaintiff's engagement for more than four years at Pink Pony, the overall consistency of her work there, and the fact that Pink Pony was her primary source of income for the majority of that time, weighs in favor of a finding of "employee" on this factor as well.

#### 6. *Factor 6: Extent to which Plaintiff's service is integral to the alleged employer's business*

Plaintiff's services were an integral part of Pink Pony's business. Pink Pony is an adult entertainment club and so it needs adult entertainers. Pink Pony does not dispute this point. (Doc 32–1 at 19 ("De-

fendant does not dispute that entertainers are integral to its operations as a gentleman's club.").)

### 7. *Other factors*

Defendant points out that the parties entered into an "Independent Contractor Agreement" when Plaintiff commenced her work at Pink Pony. (Stone Decl. ¶ 28, Ex. A.) Defendant immediately concedes, however, that the parties obviously "cannot 'contract around' the requirements of the FLSA." (Doc. 32–1 at 21.) Defendant nonetheless urges the Court to consider the contract and afford it the deference to which it is entitled under binding precedent.

In particular, Defendant points to the Eleventh Circuit's recent decision in *Crew One Prods., Inc. v. Nat'l Labor Relations Bd.*, 811 F.3d 1305 (11th Cir.2016).[4] Defendant argues that the Eleventh Circuit "gave substantial deference to the fact that the plaintiffs had signed independent contractor agreements." (Doc. 39 at 2.) The Court reads the case differently.

To start, it is not insignificant that *Crew One* was brought under the National Labor Relations Act ("NLRA")—not the Fair Labor Standards Act—and involved review of a decision by the National Labor Relations Board as to whether stagehands were "employees" of a referral service. The employee/independent contractor analysis in *Crew One* is based upon agency law—in particular, the factors listed in the Restatement (Second) of Agency, § 220(2) used to distinguish between a servant and an independent contractor for tort liability purposes. Although some of the factors in § 220(2) are similar to those in the FLSA economic realities test, *e.g.*, degree of control, duration of employment, and who sup-

plies the instrumentalities and tools of the work, other factors from the tests are different. More fundamentally, though, the FLSA economic realities test is derived from the broad "suffer or permit to work" definition of employment contained in the FLSA itself, 29 U.S.C. § 203(g), and neither the NLRA nor the Restatement (Second) of Agency employs a standard nearly that broad. *See Antenor v. D & S Farms*, 88 F.3d 925, 937 n. 5 (11th Cir.1996) (noting that the FLSA's "suffer or permit to work" definition of employee has been called " 'the broadest definition [of employee] that has ever been included in one act.' ") (quoting *United States v. Rosenwasser*, 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, 89 L.Ed. 301 (1945) (quoting 81 Cong. Rec. 7,657 (1938) (statement of Sen. Hugo Black)).

Even putting aside these very important distinctions, all *Crew One* held with regard to independent contractor agreements was that the National Labor Relations Board should not have discounted the signed agreement as evidence of the parties' intent to form an independent contractor relationship simply because the alleged employer required all workers to sign one. *Id.* at *6 ("Contrary to the argument of the Board, the significance of the agreements is not 'undercut' by the fact that all of the stagehands signed one. The Board cites three decisions to argue that the totality of the circumstances outweighs the significance of the agreements, but all three decisions are distinguishable. In each case, the employer exercised control over the manner and means of performance, which is the most important factor.") That is not to hold such an agreement should get "substantial deference," as De-

---

4. Defendant's Motion for Leave to File a Supplemental Brief addressing this new precedent was denied by the Court on February 5, 2016. (Doc. 40.) The Court noted therein that supplemental briefing was not required

because the Court must follow binding precedent and it was "enough that Defendant has brought the very recently published case to the Court's attention." (*Id.* at 1–2.)

fendant argues, but only that the agreement should not be discounted as evidence of the parties intent to form a certain kind of relationship. If the Eleventh Circuit gave substantial deference to any factor, it was, as illustrated in the parenthetical quote above as well as elsewhere in the decision, the alleged employer's control over the employee. *Id.* at 1314 ("The most important factor, control, supports [finding stagehands independent contractors.] ... The only factor that weighs in favor of the opposite result is the hourly payments, but this factor is outweighed by the totality of the other factors, especially the lack of control.") Such emphasis is consistent with adjudication of National Labor Relations Act cases. *See NLRB v. Associated Diamond Cabs, Inc.,* 702 F.2d 912, 919 (11th Cir.1983).

■ Here, as in *Clincy,* Plaintiff signed an independent contractor agreement, and she also deducted, as self-employed business expenses on her tax returns, the cost of items purchased to work at Pink Pony. (Hanson Dep. at 18–19, 62–63.) However, the label that she attempted to assign to herself or that Pink Pony attempted to assign to her is not itself dispositive. Rather, "[i]n deciding whether an individual is an 'employee' within the meaning of the FLSA, the label attached to the relationship is dispositive only to the degree it mirrors the economic reality of the relationship." *Donovan v. Tehco, Inc.,* 642 F.2d 141, 143 (5th Cir.1981); *see also Tony & Susan Alamo Found. v. Sec'y of Labor,* 471 U.S. 290, 302, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985) ("the purposes of the Act require that it be applied even to those who would decline its protections"); *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 729, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) ("Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act."); *Freund v. Hi-*

*Tech Satellite, Inc.,* 185 Fed.Appx. 782, 783 (11th Cir.2006) (not listing an individual's subjective belief about her employment status as a factor that guides an inquiry in this Circuit into the economic reality of a work relationship); *Harrell,* 992 F.Supp. at 1353 ("Defendant's ... additional factors (characterization for tax purposes and the provision of employee benefits) are not relevant. Defendant cites no case which considers these factors in the context of the broad 'suffer or permit to work' definition of employment contained in the FLSA.").

### 8. *Consideration of all factors*

■ After careful consideration of all of the factors, it is clear that the record contains evidence that could sufficiently support a finding that Plaintiff was an employee under the FLSA. Evidence supports a finding of employee status under all of the regular six factors, and the fact that Defendant—and, at times, Plaintiff herself—labeled Plaintiff an 'independent contractor' is "dispositive only to the degree it mirrors the economic reality of the relationship." *Donovan,* 642 F.2d at 143. As illustrated above, it would take a funhouse mirror to reflect such a reality.

Defendant argues that Plaintiff was properly categorized as an independent contractor, relying primarily upon *Freund,* 185 Fed.Appx. 782, and *Perdomo v. Ask 4 Realty & Mgmt., Inc.,* 298 Fed.Appx. 820, 821 (11th Cir.2008). However, the Eleventh Circuit's application of the above six-factor test to a home satellite installer (in *Freund* ) and a real estate agent (in *Perdomo* ) are so clearly distinguished from the application of that same test to an exotic dancer working in a fixed physical premises owned and/or managed as a regular business by the putative employer that the Court need not go through each of the factors here. Defendant need only com-

pare the above analysis of the factors in this case with Defendant's own description of how those factors were assessed in *Freund* and *Perdomo* to see the material differences. (Doc 32–1 at 4–8.) Applying the six-factor economic realities test to the employment relationship evidenced in *this* case, Defendant's Motion for Summary Judgment that Plaintiff is an independent contractor must be DENIED.

## B. Proof of Overtime Worked

Defendant argues that they are also entitled to summary judgment on Plaintiff's overtime wages claim because Plaintiff is unable to provide a reasonable estimate of her damages. (Def's. Br. Summ. J. at 23–24.) Plaintiff responds that the evidence in the record is sufficient to enable a jury to find that Plaintiff worked overtime hours without proper compensation.

 An employee who brings suit under the FLSA for unpaid overtime compensation has the initial burden of proving that she performed work for which she was improperly compensated. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), *superseded by statute on other grounds as stated in Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1344 n.6 (11th Cir.2007). A plaintiff may satisfy this requirement by relying on the employer's records.[5] *Id.* at 687, 66 S.Ct. 1187. The Supreme Court established a shifting burden of proof when the employer's records are inaccurate or inadequate to show the precise extent of uncompensated work. Where the employer fails to submit accurate records, to recover, the employee "need only show 'he has in fact performed work for which he was improperly compensated and . . . produce sufficient evidence to show the amount and extent of that

work as a matter of just and reasonable inference.'" *Brock v. Norman's Country Market, Inc.*, 835 F.2d 823, 828 (11th Cir. 1988) (quoting *Anderson*, 328 U.S. at 687, 66 S.Ct. 1187). Upon such a showing, "the burden shifts to the employer [to come forward with evidence of the precise amount of work performed] to prove its claim or disprove the employee's, and upon failing to do so, the court can award damages to the employee even if the result is only approximate." *See Etienne v. Inter-County Sec. Corp.*, 173 F.3d 1372, 1375 (11th Cir.1999) (citing *Anderson*, 328 U.S. at 687–88, 66 S.Ct. 1187); *see also Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1316 (11th Cir.2007) (same).

 Where an employer has not kept adequate records of its employees' wages and hours, "[t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [the FLSA]." *Anderson*, 328 U.S. at 688–89, 66 S.Ct. 1187; *see also Brock*, 835 F.2d at 828. In establishing this burden-shifting analysis, the Supreme Court held that even where the lack of accurate records is the result of "a bona fide mistake as to whether certain activities . . . constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances." *Anderson*, 328 U.S. at 688, 66 S.Ct. 1187. Nor will a plaintiff's claim for overtime wages be barred by the rule that precludes the recovery of uncertain and speculative damages which only applies to situations where the fact of damage is itself uncertain. *Id.*

5. The FLSA obligates every employer to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him. . . . " 29 U.S.C. § 211(c).

But here we are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute. The damage is therefore certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a case *"it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts."* It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages.

*Id.* (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931)) (emphasis added).

The parties agree that the only evidence indicating that Plaintiff worked more than 40 hours in a given week is the following section of Plaintiff's deposition:

Q Do you know how often or on how many occasions you contend you worked more than 40 hours in a workweek?

A Could you repeat the question?

Q Sure. On how many occasions do you believe you worked more than 40 hours in a workweek?

A I don't know.

Q A few? A lot?

A Not often.

Q Every week?

A No. It used to happen a couple years ago. It happened a lot. I used to do it quite a bit. I'd work more than 40 hours a week.

Q Back in, what, 2012?

A Yes.

Q Did you work any weeks more than 40 hours in 2013?

A I might have once or twice.

Q And what about in 2014?

A I don't believe I have this year.

(Hanson Dep. at 115:16–116:11, Doc. 32–3).[6] Plaintiff's testimony that she has worked more than 40 hours in a workweek on occasion during the period of time within the statute of limitations is sufficient under *Anderson* to shift the burden to Pink Pony to proffer evidence of the precise amount of work performed by Plaintiff in order to disprove her claim. Pink Pony has offered no evidence.

 Although Plaintiff is unable to demonstrate the exact amount of hours for which she was not compensated as overtime, Plaintiff has nonetheless shown the amount and extent of her work as a matter of just and reasonable inference as required by the Supreme Court in *Anderson.* On Defendant's motion, is the duty of the factfinder to draw all reasonable and just inferences in Plaintiff's favor, and a reasonable jury hearing this testimony could conclude that Plaintiff worked some amount of overtime hours for which she was not compensated.[7] Based on a review

6. To add some context to the deposition environment Plaintiff faced, the Court notes that, just before the overtime hours excerpt block quoted above, Plaintiff was peppered with questions such as, "What is your understanding of what the potential impact is on the club of your lawsuit?" "[W]hat do you think might happen if 300 dancers were to successfully sue the Pink Pony?" "Do you know if a lawsuit like this could effectively force you to lose your job by virtue of closing the club down?" and "Are you aware that a suit like this could force some of your friends at the Pink Pony to lose their jobs?" (Hanson Dep. at 114:3–115:15).

7. The Court notes that if Plaintiff testifies at trial as she did during her deposition and does not ultimately provide some approximation of her overtime hours worked per year, her claim for damages may be subject to a motion for directed verdict by Defendant. *Cf. Olivas v. A Little Havana Check Cash, Inc.,* 324 Fed.Appx. 839, 844 (11th Cir.2009) (hold-

of the record evidence, there is a genuine issue of material fact as to whether Plaintiff performed work for which she was allegedly not properly compensated. Plaintiff's inability to state with precision and complete accuracy the total number of overtime hours worked without pay, as requested by Defendant, is not a bar to recovery. Defendant's Motion for Summary Judgment on this issue is therefore also **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. 32] is **DENIED**.

The Court finds that the disputes between the parties rationally should be capable of settlement, particularly now that the Court has made the above determinations. Accordingly, this matter is **REFERRED** to the next available Magistrate Judge for mediation. Mediation **SHALL** conclude within 45 days of the entry of this Order. In the event the parties fail to reach an agreement, they are **DIRECTED** to submit their proposed Consolidated Pretrial Order within 15 days of the conclusion of the mediation and the case **SHALL** be placed on the next available trial calendar. The parties are **DIRECTED** to advise the Court how many days they estimate the trial will take within 10 days of the entry of this Order.

**IT IS SO ORDERED.**

ing that where the employee explained how and why her time records were inaccurate and provided an average number of weekly hours worked, such evidence established the amount and extent of the employee's work as a matter of just and reasonable inference).